Filed 7/20/22 In re Frank M. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re FRANK M. et al., Persons Coming Under the Juvenile Court Law. | B315449 (Los Angeles County Super. Ct. No. 19CCJP07322A/B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. CLAUDIA M., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Lisa A. Brackelmanns, Juvenile Court Referee. Affirmed.

Ernesto Paz Rey, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and William D. Thetford, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Claudia M. (mother) appeals from an order terminating her parental rights to her two children, Angel (born July 2012) and Frank (born April 2017). Mother contends that the trial court erred when it declined to apply the beneficial parent-child relationship exception to termination of parental rights found in Welfare and Institutions Code section 366.26, subdivision (c)(1)(B)(i).[1] Specifically, mother contends that the trial court improperly applied the law of the beneficial parent-child relationship exception as set forth in *In re Caden C.* (2021) 11 Cal.5th 614 (*Caden C.*). We find no error and affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND
**Events leading to detention of the children**

The family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) on October 5, 2019, when mother was arrested for possession of methamphetamine, having an open container of alcohol in her

---

[1] All further statutory references are to the Welfare and Institutions Code.

vehicle, and child endangerment.  Mother was observed by law enforcement throwing an object (later found to be methamphetamine) over a wall.  Mother also had an open container of alcohol in the car, which she admitted drinking.  The children were in the car at the time.  Mother stated that she had no intention of driving the car and denied tossing the methamphetamine.  Mother's driver's license was suspended, and the vehicle's registration was expired.  The children were taken into protective custody.

The following day the social worker interviewed mother at the sheriff's station holding facility.  Mother claimed not to understand why DCFS was called.  Mother's brother, Jesus M., had come to the police station to collect the children.  Mother denied throwing anything over the fence but admitted purchasing the container of alcohol and taking a sip.  She continued to claim she did not intend to drive.  Mother was forthcoming about her substance use, indicating that, if tested, she would test positive as she used methamphetamines a few days earlier.  Mother stated she began using methamphetamines when she was about 20 years old.  She had attended treatment and, prior to her last use, had been sober for 18 months.  Mother reported a willingness to cooperate with DCFS and admitted her error in drinking, relapsing, and placing her children at risk of abuse or neglect.  Mother asked that the children be placed with Jesus M. and his girlfriend.

**Section 300 petition and transfer**

On November 12, 2019, the San Bernardino County Juvenile Court sustained a section 300 petition alleging that mother struggled with substance abuse which impaired her ability to care for her children and that the alleged father, whose

3

whereabouts were unknown, knew or should have known of mother's substance abuse problem. The court dismissed an allegation that mother left her children without supervision.

On November 22, 2019, the Los Angeles County Superior Court accepted jurisdiction of the entire case upon transfer from San Bernardino County. The juvenile court appointed counsel, ordered the children remain suitably placed, and set a disposition hearing for February 5, 2020.

**Disposition**

DCFS filed a report in connection with the February 2020 disposition hearing. The children had been placed with paternal uncle Juan M. and his wife, Delia M.

In an interview with a social worker on January 22, 2020, mother admitted to having substance abuse problems. When asked whether it affected her parenting, mother stated, "yes and no." Mother acknowledged that her children needed a sober parent, that she started using drugs when she was 17 years old, and had been using drugs for 16 years. Mother used methamphetamine daily until she became pregnant with Angel. Mother stopped using drugs, but relapsed one to two weeks before giving birth to Angel. Mother believed her drug use resulted in Angel being born prematurely in July 2012. The Child Welfare Services/Case Management System contains a July 11, 2012 referral stating that Angel was born with a positive toxicology screen for amphetamine. Mother admitted to once inhaling drugs while pregnant. A voluntary family maintenance (VFM) case was opened on August 6, 2012, but was closed on October 15, 2013, with the family having stabilized.

During the VFM, mother completed a six-month substance abuse program, but she relapsed after a year of sobriety. Mother

4

said she used drugs in her home every day while Angel slept. Mother said she was able to adequately care for Angel while she was under the influence of methamphetamine. When asked if she could continue to take care of the children while under the influence of methamphetamine, mother stated, "No, I don't believe I can take care of them."

Mother met Frank's father, Frank R., in 2014 and they maintained a relationship for two years.[2] Frank R. also used methamphetamine, and they would use the drug together. Mother denied using drugs during her pregnancy with Frank, but relapsed five months after the child's birth because she learned Frank R. had been unfaithful. In 2017 she enrolled in another substance abuse program and remained sober for about 18 months, before she relapsed in April 2019.

Mother said her last drug use was January 16, 2020. She had positive drug tests on both December 20, 2019, and January 8, 2020. Mother denied being under the influence at the time of her October 5, 2019 arrest. She also denied possessing or disposing of methamphetamine. Mother reported that after the police ran her name, she was held because she was on felony probation.[3]

Mother claims she was not permitted to contact her brother and was held for about three weeks, during which she was frantic about the children and did not know where they were. Mother

---

[2] Neither Frank's father, Frank R., nor Angel's father, Ruben R., is a party to this appeal.

[3] Mother admitted being on felony probation for identity theft at the time of her arrest. She also admitted to a criminal history of about seven arrests for petty offenses.

reported that by the time of her court hearing, she pled guilty regardless of her guilt because she wanted to get out and see her children. Mother reported that she was told if she pled no contest, she would be released the same day, but if she did not, she would have to wait in jail for trial.

An in-person interview with Angel was conducted by the social worker on January 21, 2020. Angel answered most questions "I don't know" or "I don't remember," including his father's name and why he was not living with his mother. Angel stated that he did not know what drugs were and did not know what methamphetamine was. Angel denied ever seeing mother acting strangely or inappropriately. When asked if he wanted to tell anything to the social worker, Angel responded, "I love her (mother). [I]t hurts my feelings when she cries. She misses us." Angel reported that he had enjoyed visiting with mother. They played with bubbles, and mother gave them a lot of stuff, like candy.

The social worker noted that mother was visiting the children every Saturday for about six hours. The visits were good, and the children were excited to visit with mother. Mother and the children were affectionate towards one another, and Angel cried a lot after the visits.

The disposition hearing was held on February 5, 2020. The court received DCFS's reports into evidence, declared the children dependents of the court and removed them from parental custody pursuant to section 361, subdivision (c)(1). The court denied reunification services for the fathers and ordered that mother receive reunification services. Mother's case plan included a full drug and alcohol program, random weekly drug testing, a 12-step program, a parenting program, individual

6

counseling, and a psychiatric evaluation for psychotropic medication.  The court ordered a minimum of six hours a week of monitored visits for mother and set a six-month review hearing for August 4, 2020.[4]

**Review period/termination of reunification services**

On April 8, 2020, mother participated in a Child and Family Team (CFT) meeting and requested unmonitored visits. On April 23, 2020, the social worker reviewed mother's progress and liberalized her visits to unmonitored.  The social worker noted that mother was in compliance with the DCFS case plan including drug testing and court-ordered counseling.  Mother's visits were punctual and appropriate, and the children reported that they enjoyed the visits.

On May 26, 2020, the social worker confirmed that mother had completed a six-month drug program.  However, it was later learned that mother had tested positive for methamphetamines on May 22, 2020.  On June 11, 2020, DCFS filed a section 388 petition asking the juvenile court to restrict mother's visits to monitored.  The juvenile court set a hearing on the section 388 petition for September 21, 2020, to coincide with the six-month review hearing, and ordered DCFS to file another report.

After mother completed the six-month drug program, she began aftercare services.  It was recommended that mother enter an in-patient program because she needed a higher level of care. Mother enrolled in a residential program on July 6, 2020. However, mother tested positive for amphetamine and

---

[4]      On May 26, 2020, the juvenile court advanced and vacated the August 4, 2020 hearing and continued it to September 21, 2020.

methamphetamine on July 6 and July 7 and was terminated from the program on August 6, 2020. On September 2, 2020, mother reentered the six-month outpatient program she had previously completed.

From February 6, 2020, to August 27, 2020, mother tested negative for drugs 16 times. She failed to test on five occasions. She tested positive on May 22, 2020, and June 9, 2020.

A visit was scheduled for August 13, 2020, from 8:30 a.m. to 2:30 p.m. for DCFS to observe mother with the children. Mother failed to attend, answer her phone, and to respond to the social worker's text message. Two subsequent visits were cancelled due to the children's illness. Mother rarely called the children. When asked what they did during visits with their mother, the children said they watched television and played video games because mother usually slept.

Mother failed to attend the CFT meeting also scheduled for August 13, 2020. The social worker attempted to reschedule, but mother was unavailable.

At the six-month review hearing, DCFS recommended that the juvenile court terminate mother's reunification services and set a section 366.26 hearing to consider termination of parental rights.

On September 21, 2020, the juvenile court granted DCFS's section 388 petition, ordered monitored visits for mother, and continued the six-month review hearing to December 2, 2020.

In a last minute information for the court, DCFS reported that mother missed 14 drug tests between July 10, 2020, and October 29, 2020. Mother tested positive for amphetamine on September 11, 2020. Mother admitted her relapse, but minimized it by stating that relapse is part of recovery. Mother

8

also avoided her appointments with the social worker, and several meetings had to be rescheduled.  Mother acknowledged a cycle of relapse every 90 days.

During the pendency of the case, mother completed a six-month drug program, 30 days of a residential program, and was attending another six-month program.  Mother continued to struggle with sobriety, however.  She admitted being unable to apply the tools she learned in the treatment programs to address her addiction.

On September 17, 2020, the social worker received a confirmation from mother's parenting education provider that mother had completed 30 sessions of the 52 sessions required for completion.  Mother had increased insight on child safety concerns.

Mother had not been consistent with monitored visits.  She did not visit the children weekly for various reasons, including lack of transportation and illness.  Visits were cancelled by the caregivers due to the children being exposed to COVID-19 from classmates.  While the children were required to quarantine, the caregivers insured the children had phone access, though mother's phone calls were irregular.  On October 15, 2020, mother agreed to a new schedule with calls on Mondays, Wednesdays, and Fridays, in addition to the Saturday monitored in-person visits.

Mother continued to show an inability to maintain the regular Saturday in-person visits, and her last-minute cancellations left the children feeling hopeless.  At a CFT meeting, DCFS expressed concern about mother's inconsistent visits.  Mother then asked to be informed of the children's medical and dental exams, but did not show up for Angel's dental

procedure even when given notice three months in advance, resulting in a setback for mother and Angel's relationship. Mother continued to make unfulfilled promises to the children.

During one observed visit, mother was not fully engaged with the children when the social worker was not present. The caretaker informed the social worker that during one visit, mother spent four hours watching television with the children. Although mother told the social worker that she brought healthy snacks for the children, she continued to bring sugary snacks and chips to feed the children for their lunch.

Mother participated in a psychological evaluation and was diagnosed with depression, anxiety, and posttraumatic stress disorder and prescribed psychotropic medication.

DCFS reported that due to delays and continuances required by the COVID-19 pandemic, mother had ample opportunity to make the changes necessary to allow the children to be returned to her custody. However, she failed to demonstrate any change of behavior. Mother had no relapse prevention strategy in place and had not graduated past step three in her 12-step program. Mother was unemployed and continued to rely on community services to pay her monthly rent.

DCFS further reported that on November 16, 2020, when asked why mother was no longer participating in court-ordered random drug testing, mother initially stated that she attended drug testing through her substance abuse counseling. Mother later admitted, however, that she had several relapses since her relapse in September 2020. Mother admitted she was not truthful with her substance abuse counselor and that the counselor believed that she was sober. Mother was ashamed that

she chose drugs over her children and talked about feelings of wanting to give up.

In a November 17, 2020 conversation between the social worker and mother's substance abuse counselor, it was learned that the counselor was unaware of mother's missed drug tests or relapses. The counselor recommended that mother enter another inpatient program because in her four programs she had not committed to making the changes necessary to refrain from using drugs.

On November 18, 2020, the social worker was again unable to reach mother. Mother also failed to respond to the caregivers' and counselor's phone calls. A police welfare check was requested and completed around 5:20 p.m. Mother opened the door for the officer. Mother appeared drowsy but denied being under the influence of any substances. Mother told the officer that she did not need any help. Mother later told the social worker that she had been asleep for about 72 hours.

Because of mother's continued drug use and her history of relapsing every 90 days, DCFS recommended termination of family reunification services and scheduling a section 366.26 hearing to consider termination of parental rights.

On December 2, 2020, the juvenile court terminated mother's reunification services and set a section 366.26 hearing for March 22, 2021.

**Status review and section 366.26 report**

DCFS filed a status review report on March 22, 2021. The children had resided with their caregivers since January 2020 and continued to do well in their placement. There had been no placement issues, and DCFS had no concerns about the level of care the children received.

11

Since December 2, 2020, mother had provided no documentation that she continued to participate in court-ordered services.  Her visitation with the children had been sporadic and limited.  She had not stayed in touch with the assigned social worker, and she had not contacted the caregivers to follow up on the children's well-being.  Mother had moved into a sober living home on December 9, 2020, but left the home one week later.

The caretakers reported that mother's visits were sporadic. Mother often telephoned the caretakers to cancel visits because she was having COVID-19 symptoms.  During telephone visits mother frequently told the children she could not talk because she had to take medication.  Mother rarely called the children during the week and when she did, she would terminate the calls after about five minutes.  The children told their caregivers that when mother called she was lying down in her bed and did not seem to be alert or attentive to the children.  Mother informed the children that they were not permitted to refer to the caregivers as "mom" and "dad."  She told the children they would soon be a family again, which interfered with the caretakers' ability to parent the children.

On February 11, 2021, Angel reported his disappointment with mother because he would wait all week to visit mother for a few hours and she would spend most of the time on her phone. Angel had his iPad ready every Monday, Wednesday, and Friday for mother's call, but mother often texted the caregivers that she was not available.  Angel often hoped mother would call him.

The caretakers continued to support mother with visits. They were ready to proceed with adoption to provide the children a permanent home.  DCFS recommended that the juvenile court

12

identify adoption as the children's permanent plan and continue the hearing for 120 days to allow DCFS to notice the fathers.

The juvenile court continued the section 366.26 hearing to September 27, 2021, and set another review hearing for September 20, 2021.

In a last minute information for the court, DCFS informed the court that at a recent visit, mother took Frank into a bathroom stall and allowed him to speak to his father on her cell phone. The caregiver confirmed that Frank reported the incident. The caregiver tried to intervene, but mother took Frank into the bathroom stall. The caregiver stated that mother would make excuses to go to her car during visits and attempted to take the children into her car alone. Both caretakers had to be present at visits in order to ensure that mother did not take the children into her car. Mother continued to arrive late to visits and to leave early. Her phone calls continued to be sporadic.

Frank reported that mother spent most of her time during the visits talking to others on her phone and that he wanted his caregivers to be his mommy and daddy. Angel said he would get all his homework done in order to spend time with mother, but mother was then on her phone most of the visit. Angel said once he became ill during a visit and told mother he needed to rest. Mother became angry and told him, "I know you don't want to play with me anymore." This made Angel feel bad so he tried to get up and play with mother but could not. Mother walked away from him and would not play with him after that.

In a September 20, 2021 status review report, DCFS reported that the children remained with their caretakers with no placement issues. The caretakers' biggest concern was working with mother on effective communication so that the

13

children's feelings did not get hurt.  Mother made comments to the children, such as telling them that she was their only mother and no one could replace her.  Mother also told Angel, "you don't want to play with me because you don't love me anymore" and "how would you treat me like this when I always bring you toys, clothes that you want."  Angel would have angry outbursts when mother made such comments.  Angel was happy to visit mother, but he would be disappointed when mother was late for a visit or when she stayed on her phone during visits.  Frank complained that the visits were boring and that the six-hour visits were too long.

The caretakers reported that mother's visits remained sporadic and were poor quality, due to lack of bonding and mother's inability to arrive on time.  There were several visits where mother was between 45 and 90 minutes late.  The children continued to report that mother spent the majority of her time on the phone instead of spending time with them.  The children wished the mother could be more available to them during phone calls and weekly visits.

**Mother's section 388 petitions**

Mother filed a section 388 petition for each boy asking the juvenile court to reinstate family reunification services or grant her unmonitored visits.  The juvenile court set the petitions for hearing on September 27, 2021.

**Section 366.26 and 388 hearings**

The juvenile court first conducted the hearing on mother's section 388 petitions.  Mother testified as to the skills she learned in her substance abuse program and as to her progress in drug treatment.  She was on the fifth step of her 12-step program and had a sponsor.  Mother had been in mental health counseling and

was consistently taking her medication.  Mother had completed a 52-week parenting program and testified to what she learned in the class.  Mother admitted she would have had a stronger bond with her children if she engaged with them more by playing, reading, and talking with them.

Mother said when she arrives for visits she gives the children a hug.  She said Frank runs to her and Angel wants to run to her, but the caretakers prevent him from doing so.  Mother denied ever being more than two to three minutes late for a visit, despite the DCFS reports otherwise.

The juvenile court found that mother showed neither changed circumstances nor that giving mother six more months of family reunification services would promote the children's best interests and denied mother's section 388 petitions.

The court next turned to the section 366.26 hearing.  When asked to describe her parental relationship with Frank, mother repeated that he would run to her at the visits and tell mother that he loved her.  At the end of the visit, Frank would kiss a toy, give it to mother, and ask her to bring it back at the next visit.  At the next visit, mother would bring the toy, kiss it, and give it back to Frank.  At the visits, Frank would spend most of his time with mother and not with the caregivers.  Mother reported that Frank told her, "I would never let them take me away from you."  Mother reported that Frank asked her permission to call the caregivers "mommy" and "daddy."  Initially, mother denied permission, but later told him it was okay.  As to Angel, mother stated that she could "see in his eyes that he just wants for our little family to be back together."

When asked about the incident where she took Frank into a bathroom stall to call his father, mother admitted to being

15

unsupervised with the child at the park but denied that she allowed Frank to speak with his father.

Mother's attorney asked the juvenile court to find applicable the beneficial parent-child relationship exception to termination of parental rights. The children's attorney joined DCFS in arguing that the exception was not applicable and that the juvenile court should terminate parental rights.

The juvenile court found that mother had not established that the beneficial parent-child relationship exception to termination of parental rights was applicable. Regarding visitation, the court found that although mother visited the children, it also considered the quality of the visits and the fact that mother was late to most of them. As to mother's relationship with the children, the court stated, "[T]here was no evidence presented to the court to show that she is taking on a parental role with these children," noting that mother was still confined to monitored visits, which made it much more challenging for her to take on a parental role. The court concluded that there was no evidence that the bond mother had with the children was strong enough to outweigh the benefits the children would receive by being adopted.

The court's minute order stated: "The Court finds that any benefit accruing to the child from his/her relationship with the parent(s) is outweighed by the physical and emotional benefit the child will receive through the permanency and stability of adoption, and that adoption is in the best interests of the child."

The court found the children were adoptable and terminated parental rights. The court also ordered DCFS to talk to the caretakers about mother being able to continue visiting the children.

**Notice of appeal**

On September 29, 2021, mother filed a notice of appeal.

## DISCUSSION

### I. Applicable law and standard of review

When a court orders a section 366.26 hearing, "reunification services have been terminated, and the assumption is that the problems that led to the court taking jurisdiction have not been resolved." (*Caden C., supra*, 11 Cal.5th at p. 630.) The goal of the section 366.26 hearing is to "'select and implement a permanent plan for the child.'" (*Ibid.*) To guide the court in this process, "the statute lists plans in order of preference and provides a detailed procedure for choosing among them." (*Ibid.*) First, the court must decide whether the child is likely to be adopted. If so, "the court shall terminate parental rights to allow for adoption." (*Ibid.*)

However, if the parent shows that termination of parental rights would be detrimental to the child for one of the specifically enumerated reasons, "the court should decline to terminate parental rights and select another permanent plan." (*Caden C., supra*, 11 Cal.5th at pp. 630-631). The specific statutory exceptions "'merely permit the court, in exceptional circumstances [citation], to choose an option other than the norm, which remains adoption.'" (*Ibid.*)

One such exception is the beneficial parent-child relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) The exception applies where the parent proves three elements: "(1) regular *visitation and contact*, and (2) a *relationship*, the continuation of which would *benefit* the child such that (3) the termination of parental rights would be *detrimental* to the child."

17

(*Caden C., supra*, 11 Cal.5th at p. 631.) In determining whether termination of the relationship would be detrimental, "the trial court must decide whether the harm from severing the child's relationship with the parent outweighs the benefit to the child of placement in a new adoptive home." (*Id.* at p. 632.) "By making this decision, the trial court determines whether terminating parental rights serves the child's best interests." (*Ibid.*)

"When it weighs whether termination would be detrimental, the court is not comparing the parent's attributes as custodial caregiver relative to those of any potential adoptive parent(s). Nothing that happens at the section 366.26 hearing allows the child to return to live with the parent." (*Caden C., supra*, 11 Cal.5th at p. 634.) "In many cases, 'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship . . . ." (*Ibid.*) "A child would benefit from continuing a strong, positive, and affirming relationship . . . ." (*Ibid.*) Thus, "in assessing potential detriment, it [is] proper for the juvenile court to consider whether, and the extent to which, the caregivers and [parent] occupied parental roles with the minor." (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1157 (*A.L.*).) However, the juvenile court may not restrict its analysis to whether the parent is acting in a parental role. Instead, the court must focus on whether the parent and child have a "'substantial, positive, emotional attachment.'" (*In re L.A.-O.* (2021) 73 Cal.App.5th 197, 211.)

The first two elements of the beneficial parent-child relationship exception are reviewed for substantial evidence. (*In re Eli B.* (2022) 73 Cal.App.5th 1061, 1068 (*Eli B.*).) Under this standard, we must "view the evidence in the light most favorable to the trial court's order, drawing every reasonable inference and

resolving all conflicts in support of the judgment." (*In re Marina S.* (2005) 132 Cal.App.4th 158, 165.) We review the third element under a hybrid standard, reviewing the factual determination concerning the detriment analysis for substantial evidence but the ultimate weighing of the relative harms and benefits of terminating parental rights for an abuse of discretion. (*Eli B., supra*, at p. 1068.)

## II. The record supports the juvenile court's decision

The record supports the juvenile court's determination that mother failed to prove the elements necessary to establish the beneficial parent-child relationship exception to termination of parental rights.

### A. *Regular visitation and contact*

The record reveals that mother's visits were not consistent for much of the reunification period. Mother failed to show up for visits, cancelled visits, and often remained on her cell phone or slept during the visits. Both boys expressed disappointment that mother spent the majority of the time during visits on her phone. During telephone visits, mother often told the children that she could not talk. She rarely called the children during the week, and when she did, she would terminate the phone calls after about five minutes. When mother called, she was often lying in her bed and did not appear alert or attentive to the children. As the trial court noted, mother was late to many visits and the record showed that the visits were of poor quality. These facts support a judicial determination that mother's visits were not sufficiently consistent to establish the exception.

### B. *Detriment*

The record supports the trial court's determination that mother and the children did not have a sufficiently substantial,

positive, emotional attachment such that the benefit accruing to the children from maintaining the relationship would be outweighed by the physical and emotional benefit the children would receive through adoption. On the contrary, the record reveals that the relationship adversely affected the children in many ways.

In assessing detriment, a court may consider whether children are "exhibiting stress over their parents' lack of consistent visitation." (*Eli B., supra*, 73 Cal.App.5th at p. 1071.) Here, both children expressed negative emotions surrounding mother's inconsistent and inattentive visits. In August 2020, the caregiver commented to the social worker that what Angel needed most was for mother to be consistent with her visits and telephone calls. Mother's last-minute cancellations of her visits left the children feeling hopeless. When mother did visit, the boys did not get sufficient quality interaction with her. Mother was frequently late to visits and ended them early. Both children complained that mother often slept during their visits, leaving them to watch television or play video games. Angel expressed disappointment because he would wait all week to visit with mother and she would spend much of the time on her phone. Angel also waited with his iPad ready every Monday, Wednesday, and Friday and was disappointed when mother texted the caregivers that she was not available. The children's feelings were hurt by mother's actions. They were also hurt by mother's comments, including her comments that no one should replace her as their mother and her comments suggesting that Angel did not love her anymore. These facts support the juvenile court's finding that mother's actions and comments did not create the type of substantial, positive bond required to meet the exception.

Further, mother violated court orders when she took Frank into a bathroom stall to speak to his father on the phone. Mother made excuses to attempt to take the children to her car alone. Mother's efforts to avoid the court orders placed the children at risk and added stress to the visits. They did not create a positive bond with the children.

As set forth above, there is ample evidence in the record that mother's interactions with the children were problematic. This evidence supports the juvenile court's determination that the children's relationship with mother was not of such a quality that the termination of her parental rights would be detrimental to them.

## III. The record does not suggest that the court failed to apply the correct legal standard

Mother argues that the juvenile court erred because it applied the wrong legal standard. Specifically, mother contends that the trial court incorrectly considered whether mother occupied a parental role in deciding whether the beneficial relationship exception applied. As set forth below, we find that the juvenile court did not improperly restrict its rationale to the question of whether mother occupied a parental role in the children's lives.

When it terminated mother's parental rights, the juvenile court considered all of the evidence before it. The court noted that mother's testimony "was really showing her, I think, regrets of what could have happened, could have been done." However, there was "no evidence" that mother was taking on a "parental role" with the children. The court further elaborated on this comment, adding that there was no evidence that mother was "able to be involved with them on a day-to-day basis with all of

21

the things they have to deal with." Specifically, there was no evidence that mother was "counseling them when they are having problems with their friends, and re-directing them when they are having behavioral issues." Overall, there was "nothing to really show that the . . . bond that she has with her children is so strong that it outweighs any benefit that they would have in being provided with the permanency and stability that they have found in the home with the relative caregiver."

The juvenile court did not err in considering "'the strength and quality of the natural parent/child relationship.'" (*Caden C., supra,* 11 Cal.5th at p. 634.) As set forth above, "in assessing potential detriment, it [is] proper for the juvenile court to consider whether, and the extent to which, the caregivers and [parent] occupied parental roles with the minor." (*A.L., supra*, 73 Cal.App.5th at p. 1157.) What the juvenile court may not do is restrict its analysis to whether the parent is acting in a parental role. Instead, the court must focus on whether the parent and child have a "'substantial, positive, emotional attachment.'" (*In re L.A.-O., supra*, 73 Cal.App.5th at p. 211.)

The court did not improperly restrict its analysis in this case. The court considered mother's testimony regarding her relationship with the children, stating "It's very clear from her testimony today that she loves her children, but it's also very clear that she has not established the parental bond exception through her testimony." The court noted that mother's testimony showed mainly her regrets, not a quality relationship with her children. In addition to being unable to be with them on a day-to-day basis, mother was not there to help them with their relationships and behavioral issues. The court thus properly focused on the strength and quality of mother's relationship with

her children and refrained from an improper comparison with the caregivers.[5]

The cases cited by mother illustrate the difference between a court that properly considers whether the parent has occupied a parental role and improperly restricts its analysis to that specific aspect of the relationship. Mother first cites *In re B.D.* (2021) 66 Cal.App.5th 1218 (*B.D.*). The *B.D.* court acknowledged that the juvenile court did not have the benefit of the analysis in *Caden C.* before making its determination regarding the beneficial parent-child relationship exception to termination of parental rights. (*B.D., supra*, at p. 1228.) First the *B.D.* court expressed concern that the juvenile court relied "heavily, if not exclusively, on the fact that the parents had not completed their reunification plans" and did not consider how the parents' drug use impacted their relationship with the children. (*Ibid.*) Second, the record did not demonstrate that the juvenile court "examined the nature of the parent-child relationship . . . to evaluate whether a significant positive emotional attachment existed between the parents and children." (*Ibid.*) The court noted that the juvenile court also examined whether the parents occupied a "'parental role'" in their

---

[5]     Mother also suggests that the court improperly considered whether mother had overcome the issues that led to the dependency. The juvenile court noted that mother "didn't progress to unmonitored visits, which does make it more challenging for her to take on that parental role." While the juvenile court noted that mother had not progressed to unmonitored visits, it did not suggest that this alone supported its detriment finding. Instead, the court noted that the lack of unmonitored visits interfered with mother's ability to maintain a sufficiently significant emotional attachment with the children.

23

children's lives.  (*Id.* at p. 1229.)  The *B.D.* court felt that the juvenile court's references to the parents' failure to occupy a parental role "concerning" because it was "unclear what weight the juvenile court placed on these conclusions when balancing the harm" of severing the parent-child relationship.  (*Id.* at p. 1230.)  The *B.D.* court did not suggest that consideration of whether the parents play a parental role is never permissible—only that juvenile courts should not place the weight of its decision on this factor.

In *In re J.D.* (2021) 70 Cal.App.5th 833 (*J.D.*), "the juvenile court's finding on the second element was conclusory and thus problematic—that mother's relationship with J.D. did not 'amount to a parental bond.'" (*Id.* at p. 864.)  The *J.D.* court noted that the *Caden C.* court did not address whether the nature of a parent's relationship with the child must be parental.  Thus, standing alone, the juvenile court's comment was "vague and unhelpful." (*J.D.*, at p. 864.).  *J.D.* does not stand for the proposition that consideration of the parent's parental role as to the child is never permissible—only that standing alone, the use of the term "parental role" alone is insufficient to explain the denial of a parent's request to implement the beneficial parent-child exception.

Finally, mother relies upon *In re D.M.* (2021) 71 Cal.App.5th 261 (*D.M.*).  The *D.M.* court held that in denying father's argument that the beneficial parent-child relationship applied, the juvenile court erred in applying an overly narrow definition of the term "'parental role.'" (*Id.* at p. 270.)  The court stated:

> "While focusing on whether father occupied a 'parental role' in the children's lives, equating that

24

role with attendance at medical appointments, and understanding their medical needs, the court said nothing about the attachment between father and his children. *Caden C.* made clear the beneficial relationship exception is *not* focused on a parent's ability to care for a child or some narrow view of what a parent-child relationship should look like." (*Ibid.*)

As with *B.D.* and *J.D.*, nothing in *D.M.* suggests that consideration of whether the parent plays a parental role in the child's life is completely forbidden. Instead, the juvenile court may use this factor only in analyzing "whether there is a substantial, positive emotional attachment between the parent and child." (*D.M., supra*, 71 Cal.App.5th at p. 270.) As set forth in *Caden C.*, "'the strength and quality of the natural parent/child relationship' will substantially determine how detrimental it would be to lose that relationship." (*Caden C., supra*, 11 Cal.5th at p. 634.)

Other recent cases have confirmed that consideration of a parent's parental role in a child's life is not forbidden by *Caden C.* In *A.L., supra*, 73 Cal.App.5th at p. 1154, the father contended on appeal that the juvenile court improperly considered his parental role in his child's life. The *A.L.* court disagreed with the father's argument, noting that the Supreme Court did not forbid consideration of this factor. Instead, the court noted *Caden C.* confirmed that "the strength and quality of the parent's relationship with the child, including whether that parent has a parental role, is a relevant consideration to the court's detriment finding." (*A.L.*, at p. 1157.)

A similar claim was made by a father in *In re Katherine J.* (2022) 75 Cal.App.5th 303 (*Katherine J.*). The court found that

the father did not occupy a parental role, and the father argued that this consideration was prohibited by *Caden C.* The *Katherine J.* court, like the *A.L.* court, disagreed with this argument. The court explained that ". . . *Caden C.* requires juvenile courts to do more than summarily state that a parent has not occupied a parental role in [a] child's life." (*Katherine J.*, at p. 319.) However, the juvenile court's use of the term "parental role" was not error:

> "In rejecting father's arguments for the beneficial relationship exception, the juvenile court concluded that father 'has not occupied a significant parental role.' Critically, it also explained what it meant by this. The court determined that father's unresolved issues with substance abuse and violence had consistently destabilized Katherine's life for years, fatally compromising father's attempts to maintain a strong, positive emotional attachment with her." (*Id.* at pp. 319-320.)

As in *Katherine J.*, the juvenile court in this matter explained what it meant when it used the term "parental role." No error of law occurred, and substantial evidence supported the juvenile court's determination that mother failed to show that the beneficial parent-child relationship exception to termination of parental rights was applicable in this case.[6]

---

[6] Because we have determined that the juvenile court did not err, we decline to address the parties' competing arguments regarding harmless error.

26

## DISPOSITION

The order is affirmed.

_____
CHAVEZ, J.

We concur:


_____
LUI, P. J.


_____
HOFFSTADT, J.

27